UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| KENTUCKY WATERWAYS ALLIANCE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 5: 17-292-DCR |
| V. | ) ) | |
| KENTUCKY UTILITIES CO., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This is a citizen enforcement action brought by Plaintiffs Kentucky Waterways Alliance and Sierra Club against Defendant Kentucky Utilities Co. ("KU"). [Record No. 1] The plaintiffs allege that KU's handling, storage, treatment, transportation, and disposal of coal combustion residuals at the E.W. Brown Generating Station presents an imminent and substantial endangerment to human health and the environment in violation of the Resource Conservation and Recovery Act ("RCRA"), and has led to the unpermitted discharge of pollutants into navigable waters in violation of the Clean Water Act ("CWA"). [*Id.*] KU has moved to dismiss the Complaint on the grounds that the plaintiffs do not have standing to bring an RCRA claim, that the RCRA claim is barred by the abstention doctrine of *Burford v. Sun Oil*, 319 U.S. 315 (1943). The defendant also contends that the plaintiff's CWA claim fails as a matter of law. [Record No. 16] For the reasons that follow, the motion to dismiss will be granted.

**I.**

The E.W. Brown Generating Station ("E.W. Brown") is a three unit coal-fired power plant owned and operated by KU. [Record No. 1, ¶¶ 36-37] It is located on the west side of the Dix River, beside the hydroelectric dam that created Herrington Lake in Harrodsburg, Kentucky. It has been in operation since the 1950s. [*Id.* ¶¶ 37-38] E.W. Brown generates coal combustion residuals ("CCR"), consisting principally of fly ash (fine, powdery coal ash particles that are carried up the smokestack by exhaust gases) and bottom ash (larger coal ash particles that fall to the bottom of the furnace) as a result of the coal burning process. [*Id.* ¶ 38] To dispose of the CCR waste, KU has historically transported it by water through a sluice system to coal ash ponds known as "settling ponds" or "treatment ponds." [*Id.* ¶ 40] The heavier particles settle at the bottom of the ponds, while the more buoyant particles are channeled out through permitted discharges into Herrington Lake. [*Id.*]

An unlined area known as the Main Ash Pond served as the primary settling pond for many years. [*Id.* ¶ 40] It was built in the 1950s by damming a valley leading to Herrington Lake, and was twice expanded to accommodate the growing mass of CCR. [*Id.*] It now has a surface area of one hundred and fourteen acres and contains approximately six million cubic yards of CCR. [*Id.*] KU switched the sluicing operation from the Main Ash Pond to an Auxiliary Ash Pond in 2008, which was constructed as a lined temporary settling pond until the Main Ash Pond could be expanded again. [*Id.*] The Auxiliary Ash Pond is expected to be full by 2019. [Record No. 16, Exhibit 1, 1-1]

Due to surrounding land use, KU determined that further expansion of the CCR waste disposal area would be undesirable. [Record No. 16, p. 3] Instead, KU sought to continue to use the land occupied by the Main Ash Pond for CCR disposal by capping the pond and

installing a special waste landfill located physically on top of it. [Record No. 1, ¶ 41] Newly generated CCR waste would be dried and conditioned in a CCR treatment area and then deposited in the landfill. [*Id.*; Record No. 16, Exhibit 1, 1-1]

KU submitted a landfill permit application to the Kentucky Division of Waste Management ("KDWM") in 2011, and was required to submit a groundwater assessment plan ("GWAP") as part of the application process. [Record No. 16, p. 3, Exhibit 1] The GWAP was designed to provide a hydrogeologic characterization of the site, evaluate groundwater quality conditions, and assess water quality in the surface water bodies receiving groundwater discharges from the site. [*Id.* at Exhibit 1, 1-1]

The Sierra Club submitted public comments in opposition KU's landfill application. It argued that the GWAP revealed that the settling ponds were contaminating the groundwater at E.W. Brown and represented a danger to human health and the environment. [Record No. 16, Exhibit 5] The Sierra Club also believed that further study was necessary, in part, because the settling ponds are located over a fractured and permeable karst region which makes the water flow less predictable and the area more vulnerable to contamination. [*Id.* at 5-6] And despite the limited data, the Sierra Club claimed that initial testing indicated that the groundwater was likely contaminated with boron, sulfate, total dissolved solids ("TDS"), selenium, arsenic, cadmium, lead, and other coal ash metals. [*Id.* at 7-8]

The Sierra Club also alleged that contaminated groundwater was discharging *via* a network of springs into Herrington Lake, a major recreational and fishing area. [*Id.* at 3] As a result, the Sierra Club asked the KDWM to: (i) deny the landfill permit application until the existing contamination was more delineated and a corrective action plan was developed and implemented; and (ii) require KU to construct the landfill elsewhere on-site or off-site. [*Id.* at

1-2]  KDWM reviewed the application, the GWAP, and the public comments, and issued a permit to construct the landfill in July 2014.  [Record No. 16, Exhibit 3]  However, in response to the Sierra Club's comments, it required KU to submit a groundwater remedial action plan ("GWRAP") before it would issue a permit to operate the landfill.  [Record No. 16, p. 4]

The GWRAP noted that groundwater flow through the watershed containing the CCR ponds emerges in the Briar Patch and HQ Springs, which discharge into Herrington Lake at HQ Inlet via HQ Stream.  [Record No. 16, Exhibit 1, 2-3, 2-5]  Arsenic was detected in Briar Patch and HQ Springs, and concentrations of calcium, chloride, magnesium and sulfate were generally higher in that area.  [*Id.* at 2-7]  However, according to the GWRAP, KU's ongoing modifications, including closing and dewatering the Main Ash Pond, capping it with low permeability materials, and converting to dry CCR disposal in the special waste landfill, would help to ameliorate this condition because they would "significantly reduce the amount of contact between water and CCR, and therefore reduce the mobilization of CCR constituents in water with the potential to be discharged to the environment."  [*Id.* at 2-9, 2-10]

Still, the GWRAP noted that "[s]ome flow of natural groundwater through the existing CCR in the Main Pond is expected to continue over time, as the natural flow of water that existed before the Pond was filled with CCR continues into the buried valley."  [*Id.* at 2-10]  As a result, KU stated that it would work with the Division of Water "to develop a comprehensive approach to risk management that addresses the totality of surface water impacts from both groundwater and surface water discharges."  [*Id.* at 3-1]  In the meantime, it proposed a series of interim remedial actions designed to reduce the total mass of CCR constituents entering Herrington Lake via the groundwater flow system.  [*Id.*]

The Sierra Club objected to the GWRAP, arguing that "the interim remedial measures . . . while all appropriate and necessary, do very little to address the flow of contaminants from the ash ponds into Lake Herrington and in all other directions from the ash ponds." [Record No. 16, Exhibit 10, Attachment 1, p. 11] In its view, KU should have been required to conduct a more complete characterization of the groundwater contamination at the site, and then collect and treat the contaminated water. [*Id.*] However, after reviewing the public comments, the KDWM approved the GWRAP in October 2015. [Record No. 16, Exhibit 11]

Shortly thereafter, the plaintiffs sent a notice of intent to file a citizen suit under the Clean Water Act ("CWA") to KU, the United States Environmental Protection Agency ("EPA"), and the Kentucky Department of Environmental Protection ("KDEP"), a division of the Kentucky Energy and Environment Cabinet (the "Cabinet"). [Record No. 1, Exhibit A] The notice alleged that KU has discharged and continues to discharge pollutants into the waters of the United States without a permit in violation of the CWA. [*Id.* at 1] According to the notice, these discharges originate from both the now-buried Main Ash Pond and the Auxiliary Ash Pond, and migrate through groundwater which emerges in HQ and Briar Patch Springs and discharges into HQ Stream, a jurisdictional surface water that flows into Herrington Lake at HQ Inlet. [*Id.* at 2-3]

The plaintiffs also sent a notice of intent to file a citizen suit under the Resource Conservation and Recovery Act ("RCRA") on October 26, 2016. [Record No. 1, Exhibit C] The RCRA notice alleged that KU's handling, storage, treatment, transportation, and/or disposal of CCR waste at E.W. Brown has resulted in contamination in the ground and surface waters, presenting an imminent and substantial endangerment to human health and the environment. [*Id.* at 2] It also alleged that KU's remedial actions were inadequate to abate

the risk of endangerment because they failed to characterize the full extent of contamination, failed to adequately monitor ground and surface water quality, and failed to halt, abate, or otherwise adequately address the ongoing contamination. [*Id.* at 4]

After receiving the RCRA notice, the Cabinet reviewed the available data regarding the ground and surface water quality near E.W. Brown and conducted additional surface water testing. [Record No. 16, Exhibit 15, ¶¶ 7-8] It determined that water samples collected from HQ and Briar Patch Springs identified selenium levels above Kentucky's selenium water criterion, and fish samples collected from Herrington Lake adjacent to HQ Inlet contained selenium in excess of Kentucky's whole body fish tissue selenium criteria. [Record No. 16, Exhibit 14] Based on these results, the Cabinet issued a notice of violation ("NOV") to KU alleging that E.W. Brown "directly or indirectly discharged, or caused or permitted to be discharged, a pollutant or substance that has caused or contributed to pollution of a water of the Commonwealth" in violation of Kentucky Revised Statutes ("KRS") 224.70-110, and aesthetically or otherwise degraded surface waters in violation of Kentucky Administrative Regulations ("KAR") Title 401, Chapter 10:031, Section 2. [*Id.*]

KU and the Cabinet entered into an Agreed Order on January 30, 2017, to resolve the NOV and to "address any threat or potential threat to human health and the environment associated with management and storage of CCR at [the] E.W. Brown Station." [Record No. 16, Exhibit 15, ¶ 12] The Agreed Order required KU to continue to implement the GWAP, the GWRAP, and the Main Ash Pond Closure Plan previously approved by the Cabinet, and imposed a $25,000 civil penalty for the alleged violations. [*Id.* ¶¶ 13, 22] Additionally, KU was required to submit two Corrective Action Plans ("CAPs") "detailing the steps KU has taken and will take to address the matters raised in this Agreed Order and the notice of violation

dated January 11, 2017." [*Id.* ¶¶ 13-15] The first CAP was to investigate the risks associated with the contamination, its potential sources, and to consider additional remedial actions. [*Id.* ¶ 14] The second CAP was to address the discharge of ash transport water at the Auxiliary Ash Pond. [*Id.*] The CAPs require the Cabinet's approval, and are subject to a thirty day public comment period. [*Id.* ¶¶ 16, 19]

KU submitted its CAP addressing the groundwater contamination on April 14, 2017, which called for groundwater studies consisting of field sampling and site characterization, a human health risk assessment, and an ecological risk assessment. [Record No. 16, Exhibit 16; *id.* at p.12 n.7] The proposed studies may last through 2019, at which time KU would evaluate and implement remedial actions as warranted. [Record No. 16, Exhibit 16, p. 40-42]

The plaintiffs filed this action on July 27, 2017, alleging violations of the CWA and the RCRA. [Record No. 1] The plaintiffs' CWA claim alleges that KU is discharging and has discharged pollutants from the Main Ash Pond and the Auxiliary Ash Pond to HQ Stream, a navigable water, without a permit, causing irreparable harm to the plaintiffs' members and their communities. [*Id.* ¶¶ 70-78] These pollutants allegedly include arsenic, lead, selenium, and cadmium, which pose well-documented environmental and health risks. [*Id.* ¶ 43] The plaintiffs' RCRA claim contends that KU has contributed and is contributing to the handling, storage, treatment, transportation, or disposal of solid waste at E.W. Brown that may present an imminent and substantial endangerment to human health and the environment. [*Id.* ¶¶ 79-85] The plaintiffs claim that the remedial steps taken by KU are inadequate, and that their members will suffer irreparable harm unless KU eliminates the endangerment. [*Id.*]

KU argues that the Complaint should be dismissed because: (i) the Cabinet is already redressing the harms alleged in the Complaint, depriving the plaintiffs of standing to bring an

RCRA claim; (ii) *Burford* abstention applies because these matters are the subject of the Cabinet's ongoing regulatory proceedings; and (iii) the plaintiffs' CWA claim fails as a matter of law because the movement of contaminants from groundwater to surface water is not subject to regulation under the CWA. [Record No. 16, p. 2]

## II.

KU's argument that the plaintiffs' RCRA claim should be dismissed for lack of standing contests this Court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citations omitted). A 12(b)(1) motion "can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). KU's standing argument is based on administrative records that are not referenced in or attached to the Complaint, but are attached to KU's motion to dismiss. The Court may consider these records to determine whether it has jurisdiction over this case. *See Ohio Nat. Life Ins. Co. v. United States*, 922 F.22 320, 325 (6th Cir. 1990) (explaining that when a 12(b)(1) motion hinges on facts outside of the Complaint, "a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts").

KU's argument that the plaintiffs' CWA claim should be dismissed contests the sufficiency of the Complaint under Federal Rule of Civil Procedure 12(b)(6). A 12(b)(6) motion requires the Court to determine whether the Complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Although the Complaint need not contain "detailed factual allegations" to survive a motion to dismiss, the "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted); *see also Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

In general, where "matters outside the pleadings are presented to and not excluded by the court, the motion will be treated as one for summary judgment under Rule 56" and the "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  However, a court may consider "exhibits attached to the complaint, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims therein without converting the motion to one for summary judgment." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011) (internal quotation marks and citation omitted).

## III.

The RCRA is "a comprehensive regulatory system designed to promote the safe handling of solid and hazardous wastes." *Coal. for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1190 (6th Cir. 1995).  Like similarly-structured environmental laws, the RCRA is "a model of cooperative federalism." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004)

(describing the Clean Air Act). "Chief responsibility for the implementation and enforcement of [the] RCRA" rests with the EPA. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). The EPA, in turn, may authorize states to administer their own RCRA hazardous waste programs. *Coal. for Health Concern*, 60 F.3d at 1190 (citing 42 U.S.C. § 6926). Kentucky has enacted an EPA-approved hazardous waste disposal program and implements the RCRA through its program. *Id.* (citing Ky. Rev. Stat. Ann. §§ 224.01-010, *et seq.*).

In addition to state and federal enforcement, the RCRA's citizen suit provision provides that "any person" may commence a civil action against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). This provision confers the Court with jurisdiction "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste . . . , to order such person to take such other action as may be necessary, or both . . . ." *Id.* § 6972(a).

"[T]o strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits," Congress limited the scope of the citizen suit provision. *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989). A private party may not bring suit under § 6972(a)(1)(B) without giving ninety days' notice to the Administrator of the EPA, the State in which the alleged endangerment may occur, and the potential defendants. *Meghrig*, 516 U.S. at 486 (citing 42 U.S.C. §§ 6972(b)(2)(A)(i)-(iii)). Further, no citizen suit can proceed if either the EPA or the State has commenced, and is diligently prosecuting, a separate enforcement action. *Id.* (citing

42 U.S.C. §§ 6972(b)(2)(B) and (C)).  These limitations prevent unnecessary citizens' suits by allowing government agencies to take responsibility for enforcing environmental regulations, and by giving the alleged violator an opportunity to comply with the RCRA.  *Hallstrom*, 493 U.S. at 29 (quotation marks and citations omitted).  As the Sixth Circuit has explained, "[t]he notice provisions demonstrate that Congress has authorized citizen suits only when environmental officials '*fail* to exercise their enforcement responsibility' and has provided an 'interstitial' role for private parties in enforcing the statute."  *Ellis*, 390 F.3d at 475 (quoting *Gwaltney*, 484 U.S. at 60-61).

As with every lawsuit filed in federal court, plaintiffs seeking to bring an RCRA citizen suit must also satisfy Article III of the Constitution's "case" or "controversy" limitation.  *See Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 526 (5th Cir. 2008).  "The doctrine of standing is one of several doctrines that reflect this fundamental limitation."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  An association has standing to bring suit on behalf of its members when: "[(i)] its members would otherwise have standing to sue in their own right, [(ii)] the interests at stake are germane to the organization's purpose, and [(iii)] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2009) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  An association member has standing to sue in its own right when it can demonstrate that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury

will be redressed by a favorable decision." *Id.* at 180-81 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

KU does not dispute that the plaintiffs provided ninety days' notice to KU, the EPA, and the KDEP, and that neither the EPA nor the KDEP has commenced, or is diligently prosecuting, a separate enforcement action. [Record No. 1, ¶¶ 13-15, Attachment C] Likewise, KU does not contest the plaintiffs' assertion that some of their members live near and recreate in and around Herrington Lake, and that those members have suffered an "injury in fact" that is "fairly traceable" to KU's alleged conduct as KU's alleged conduct may endanger their health, that of their families and communities, and their environment (including the fish, other aquatic life, and wildlife they observe, consume, and enjoy). [*Id.* ¶¶ 19-21; Record No. 27, p. 16-17]

To redress these injuries, the plaintiffs ask the Court to declare that KU's past and present handling, storage, treatment, transportation or disposal of CCR at E.W. Brown may present an imminent and substantial endangerment to health or the environment in violation of the RCRA. [Record No. 1, p. 21 (Prayer for Relief (d))] They also seek an injunction ordering KU to take all actions necessary to eliminate the endangerment to health and the environment, including an order "to determine and implement the most expeditious, cost-effective, and environmentally sound means to eliminate the ongoing migration of CCR pollutants into groundwater, surface water, and sediments; and to fully abate the endangerment associated with CCR pollutants that have already migrated into groundwater, surface water, and sediments near the site." [*Id.* (Prayer for Relief (e))] Although the plaintiffs decline to state in advance of discovery exactly what injunctive relief would be appropriate, they suggest that in addition to the studies and recommendations for remedial measures required by the Cabinet,

the Court could redress their members' injuries by ordering KU to excavate the six million cubic yards of coal ash buried under the special waste landfill, or to clean up the contamination in Herrington Lake. [Record No. 1, p. 21; Record No. 27, p. 20]

KU argues that the plaintiffs' members' alleged injuries are not "redressable" by this Court because they "seek[] to remedy the same conditions the Cabinet and KU are addressing in the [GWRAP], Agreed Order and the CAPs—impacts to groundwater and surface water at and around E.W. Brown resulting from plant operations." [Record No. 16, p. 15] In its view, "[a] citizen suit plaintiff lacks standing to seek injunctive relief covering the same ground as obligations imposed by a regulatory agency." [Record No. 28, p. 2] The Agreed Order is designed to "address any threat or potential threat to human health and the environment associated with management and storage of CCR at [the] E.W. Brown Station," and requires KU to continue to implement the GWRAP, GWAP, and Main Ash Pond Closure Plan previously approved by the Cabinet, and to pay a $25,000 civil penalty. [*Id.*, Exhibit 15, ¶¶ 12, 13, 22] In light of these agency-imposed remedial actions, KU argues that the Court cannot award further injunctive relief. [Record No. 16, p. 15]

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw*, 528 U.S. at 181. As a result, the plaintiffs bear the burden of demonstrating that the Court could grant the relief requested and that doing so would remedy their members' alleged injuries. *See Lujan*, 504 U.S. at 561. Here, the plaintiffs seek declaratory and injunctive relief.

Federal courts have explicitly held that "declaratory relief is not an appropriate basis to support citizen suit standing," *Little v. Louisville Gas & Elec. Co.*, 33 F. Supp. 3d 791, 802 (W.D. Ky. 2014), except in "special circumstances . . . such as when a plaintiff is threatened with potential enforcement action." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d

1174, 1191 (10th Cir. 2012). *See also Nguyen ex rel. United States v. City of Cleveland*, 1:09-cv-452, 2016 WL 1031096 (N.D. Ohio March 15, 2016). As a result, the plaintiffs' claim for declaratory relief cannot establish standing to bring an RCRA citizen suit.

The plaintiffs' claim for injunctive relief is also insufficient to confer standing in this matter. In *Ellis*, the Sixth Circuit held that the district court committed reversible error by awarding injunctive relief when consent decrees between the defendant and the EPA were already addressing the injuries alleged in the complaint. *Ellis*, 390 F.3d 476. The court noted that "the decrees were just three months old when the district court entered its injunction, meaning that the remedial requirements imposed by the decrees either had just been completed or had not yet been completed at all." *Id.* Further, the court was rightly concerned that the plaintiffs "not only sought to obtain an injunction on the same terms as the consent decrees, but they also sought to obtain relief on 'more stringent terms than those worked out by the EPA.'" *Id.* at 477 (quoting *EPA v. City of Green Forest, Arkansas*, 921 F.2d 1394, 1403-04 (8th Cir. 1990)). As the Sixth Circuit explained,

> [s]uch second-guessing of the EPA's assessment of an appropriate remedy—a mere three months after the entry of the decrees—fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has 'failed' to do so, not where the EPA has acted but has not acted aggressively enough in the citizen's view.

*Id.* (quoting *Gwaltney*, 484 U.S. at 376). Courts in this circuit have applied *Ellis* in the standing context. *See Little*, 33 F. Supp. 3d at 803. When injunctive relief is not available under *Ellis*, the redressability requirement is not satisfied, and the plaintiff cannot demonstrate that it has standing to seek that form of relief. *Id.*; *see also Laidlaw*, 528 U.S. at 181.

All of the factors that made injunctive relief inappropriate in *Ellis* are present in this case. The plaintiffs brought the same concerns that form the basis of this action before the Cabinet during state regulatory proceedings. [*See* Record No. 1, Exhibits A-C; Record No. 16, Exhibits 5 and 10.] The Cabinet addressed the plaintiffs' concerns, in part, by requiring KU to submit a GWRAP and two CAPs, and to pay a $25,000 penalty. [*See* Record No. 16, Exhibits 1, 15, 16, 19.] After receiving the plaintiffs' RCRA notice, KU and the Cabinet entered into an Agreed Order which was based on the same groundwater studies that underlie this action and was designed to "address any threat or potential threat to human health and the environment associated with management and storage of CCR at [the] CCR Brown Station." [Record No. 16, Exhibit 15, ¶¶ 4-12] In line with the plaintiffs' previous demands for further study, the CAPs call for extensive groundwater studies and require KU to recommend remedial actions when the studies are complete. [*See* Record No. 16, Exhibits 5, 10, 16, 19.]

The plaintiffs filed this action just three months after the Cabinet and KU entered into the Agreed Order. [*Compare* Record No. 1 *with* Record No. 16, Exhibit 16.] The studies required by the CAPs have not been completed, and KU has not yet made the required recommendations of what remedial actions are warranted. [*See* Record No. 16, Exhibit 16.] As a result, "the remedial requirements imposed by the [Agreed Order] either ha[ve] just been completed or ha[ve] not yet been completed at all." *Ellis*, 390 F.3d 476.

Nonetheless, the plaintiffs claim that the remedial actions required by the Cabinet are "unnecessary, flawed, and unaccompanied by any commitment to implement effective remedial action," and that therefore the Court could redress their members' injuries by issuing more appropriate relief, such as ordering KU to excavate the buried coal ash or to clean up the pollution in Herrington Lake. [Record No. 27, p. 19-20] This amounts to little more than an

invitation to "second-guess[]" the state regulatory authority and to award relief on "more stringent terms" than it has imposed. *Id.* at 477 (quotation omitted). Accepting this invitation would "fail[] to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has 'failed' to do so, not where the EPA has acted but has not acted aggressively enough in the citizen's view." *Id.* (quotation omitted). As a result, the requested injunctive relief is not available to redress the alleged injuries, and cannot support a finding of standing. Accordingly, the plaintiffs' RCRA claims will be dismissed for lack of jurisdiction, as the plaintiffs' members' lack standing to bring an RCRA citizen suit at this time.[1]

## IV.

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the CWA provides that the "discharge of any pollutant by any person shall be unlawful," unless authorized by a permit under the National Pollutant Discharge Elimination System ("NPDES") or another statutory exception. 33 U.S.C. §§ 1311(a); 1342. The term "discharge of a pollutant" means, as relevant here, "any addition of any pollutant *to* navigable waters *from* any point source . . . ." 33 U.S.C. § 1362(12) (emphasis added). The term "pollutant" includes,

---

[1] Because the Court finds that the plaintiffs lack standing to bring an RCRA claim, it need not consider the defendant's *Burford* abstention argument. However, the Court notes that the *Ellis* court's concerns regarding the distribution of enforcement authority among the EPA, states, and citizens are similar to the considerations of federalism and comity that underlie the *Burford* abstention doctrine, and courts in this circuit have abstained under *Burford* in circumstances similar to those presented in this case. *See, e.g.*, *Coal. for Health Concern*, 60 F. 3d at 1189; *Ellis*, 390 F.3d at 480; *Ohio Valley Envtl. Coal. v. River Cities Disposal, LLC*, 15-cv-47, 2016 WL 1255717, at *5 (E.D. KY Mar. 29, 2016).

among other things, "solid waste," "chemical wastes," and "industrial waste" discharged into water. *Id.* § 1362(6). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharge." *Id.* § 1362(14). The term "navigable waters" means "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

The plaintiffs contend that KU has violated the CWA by adding pollutants to HQ Stream from the Main Ash Pond and the Auxiliary Ash Pond without an NPDES permit. [Record No. 1, ¶¶ 70-78] KU possesses a permit authorizing it to make regulated discharges from the Main Ash Pond and the Auxiliary Ash Pond through an external outfall designated as Outfall 001. [*Id.* ¶¶ 44-47] However, the plaintiffs claim that, in addition to these permitted discharges, KU has made and continues to make unpermitted discharges into HQ stream, a surface water body within the jurisdiction of the CWA. [*Id.* ¶¶ 48-49] These discharges allegedly result from naturally flowing groundwater, which is infiltrating the settling ponds and transporting the CCR pollutants into HQ Stream by way of the hydrologically connected HQ and Briar Patch Springs. [*Id.* ¶¶ 50-56, 61-67]

KU has moved to dismiss on the grounds that the plaintiffs have not alleged that pollutants are conveyed *directly* from the Main or Auxiliary Ash Pond to HQ stream, and to the extent that pollutants enter navigable waters after migrating through groundwater, the pollution is non-point source pollution, which cannot form the basis of a CWA citizen suit. [Record No. 16, p. 27] The plaintiffs respond that they have sufficiently alleged that the groundwater is "hydrologically connected" to HQ Spring, and that "discharges of pollutants to navigable waters via a discrete, hydrologically-connected conduit are governed by the CWA."

[Record No. 27, p. 32] Thus, the issue before the Court is whether discharges into groundwater that is hydrologically connected to navigable waters constitute the "addition of any pollutant to navigable waters from any point source" under the CWA. 33 U.S.C. § 1362(12). Other district courts have split on this question. *See, e.g.*, *Tenn. Clean Water Network v. Tenn. Valley Auth.*, 3:15-cv-424, 2017 WL 3476069, *42-43 (M.D. Tenn. August 4, 2017) (collecting cases).

There are three distinct reasons that hydrologically connected groundwater might be subject to regulation under the CWA. First, hydrologically connected groundwater could itself constitute a "navigable water" under the CWA such that an adding a pollutant to hydrologically connected groundwater would constitute the discharge of a pollutant "*to* navigable waters." Second, hydrologically connected groundwater could constitute a "point source" under the CWA such that discharging a pollutant to a "navigable water" from hydrologically connected groundwater would constitute a discharge "*from* any point source." Third, hydrologically connected groundwater could constitute a non-point source conveyance that falls within the CWA even though it is itself neither a point source nor a navigable water.

The plaintiffs distance themselves from the view that hydrologically connected groundwater itself constitutes a "navigable water." [*See* Record No. 27, p. 36.] And for good reason. Courts have overwhelmingly found that groundwater, even if hydrologically connected to navigable waters, is not itself a navigable water under the CWA. *See, e.g.*, *Rice v. Harken Expl. Co.*, 250 F.3d 264, 269 (5th Cir. 2001) ("[G]round waters are not protected waters under the CWA."); *Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994) ("Neither the Clean Water Act nor the EPA's definition asserts authority over ground waters, just because these may be hydrologically connected with surface

-18-

waters."). (citations omitted); *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798, 810 (E.D.N.C. 2014) ("Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that ground water is eventually or somehow 'hydrologically connected' to navigable surface waters."); *Copper Indus., Inc. v. Abbott Labs.*, No. 93-CV-193, 1995 WL 17079612, *4 (W.D. Mich. May 5, 1995) ("[T]he fact that these ground waters are hydrologically connected to some surface waters is insufficient to transform this case to a [CWA] cause of action.").

The reasons for this are three-fold. First, considering ground waters to be "navigable waters" would strain the language of the CWA. *See Vill. of Oconomowoc Lake*, 24 F.3d at 965 ("[W]e are confident that the statute Congress enacted excludes *some* waters, and ground waters are a logical candidate."). Second, the legislative history of the CWA demonstrates that Congress extensively considered whether to extend the CWA to groundwater, and decided against it. *See Exxon Corp. v. Train*, 554 F.2d 1310, 1325-29 (5th Cir. 1977) (discussing the legislative history). The Senate Committee on Public Works recognized "the essential link between ground and surface waters and the artificial nature of any distinction." *Id.* at 1325 (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 73 (1971)). But after a "heated debate," Congress rejected an amendment that would have extended the CWA to groundwater. *Id.* at 1327-29. Instead, Congress determined that regulation of groundwater should be left to the states. *Id.* at 1325-29; *see also Kelley ex rel. Mich. v. United States*, 618 F. Supp. 1103, 1107 (W.D. Mich. 1985).

Third, in *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court "eschewed a broad interpretation of 'navigable waters' and repeatedly cautioned against 'attempting to expand the definition of navigable waters to encompass virtually all water, regardless of its

actual navigability, location, or consistency of flow.'" *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 252 F. Supp. 3d 488, 497-98 (quoting *Chevron U.S.A., Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807, 817 (D. Md. 2015)). Accordingly, the Court finds that hydrologically connected groundwater does not itself constitute navigable waters. This conclusion finds support in "both the language and legislative history of the CWA and in the Supreme Court's decision in *Rapanos*." *Cape Fear River Watch*, 25 F. Supp. 3d at 810.

However, hydrologically connected groundwater could still be subject to regulation under the CWA if the discharge of a pollutant from hydrologically connected groundwater into navigable waters constituted a discharge from a "point source." Congress "drew a distinct line" between the discharge of pollutants from point sources and non-point sources in the CWA. *Or. Nat'l Res. Council v. United States Forest Serv.*, 834 F.2d 842, 849 (9th Cir. 1987). Discharges from point sources are subject to regulation under the NPDES, whereas the regulation of non-point sources is left the states. *Id.* The Court must respect the line drawn by Congress, and cannot extend the CWA's NPDES requirements to non-point source pollution. "This is true even though non-point-source pollution is a major contributor to the pollution of the nation's waters." *26 Crown Assocs., LLC v. Greater New Haven Reg'l Water Pollution Control Auth.*, 2017 WL 2960506, at *8 (D. Conn. July 11, 2017) (citing *Or. Nat'l Res. Council*, 834 F.2d at 849). Courts are divided on whether hydrologically connected groundwater qualifies as a point source under the CWA. *Compare id.*, *with Hawai'i Wildlife Fund v. Cty of Maui*, 24 F. Supp. 3d 980, 995 (D. Haw. 2014). The undersigned concludes that it is not.

The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well,

discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharge." 33 U.S.C. § 1362(14). Non-point source pollution, by contrast "does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 220 (2d Cir. 2009) (quoting EPA Office of Water, Nonpoint Source Guidance 3 (1987)). Groundwater is, by its nature, "a diffuse medium" and not the kind of discernible, confined and discrete conveyance contemplated by the CWA's definition of "point source." *See 26 Crown Assocs.*, 2017 WL 2960506, at *8 ("It is basic science that ground water is widely diffused by saturation within the crevices of underground rocks and soil."). As a result, the discharge of a pollutant from hydrologically connected groundwater to a navigable water does not constitute the discharge of a pollutant *from* a point source *to* a navigable water under the CWA. *See id.*; *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 252 F. Supp. 3d 488, 494 (D.S.C. 2017) ("The migration of pollutants through soil and groundwater is nonpoint source pollution that is not within the purview of the CWA.").

The final rationale for subjecting hydrologically connected groundwater to the CWA's permitting requirement is that if there is a close hydrologic connection between groundwater and a navigable water, then the discharge of a pollutant from a point source *through* the hydrologically connected groundwater to a navigable water could constitute the addition of a pollutant *to* a navigable water *from* a point source even though the groundwater itself is neither a point source nor a navigable water. The EPA has sometimes expressed this view. *See, e.g.*, Amendments to the Water Quality Standards Regulations that Pertain to Standards on Indian Reservations, Final Rule, 56 Fed. Reg. 64876, 64892 (Dec. 12, 1991) ("[T]he affected ground

waters are not considered 'waters of the United States' but discharges to them are regulated because such discharges are effectively discharges to the directly connected surface waters.").[2]

Additionally, some courts have held that coal ash ponds qualify as "point sources" and that the discharge of pollutants from a point source ash pond to a navigable water via hydrologically connected groundwater may be subject to the CWA's permit requirements even if the groundwater itself is neither a navigable water nor a point source, so long as there is a "direct" hydrologic connection. *See Tenn. Clean Water Network*, 2017 WL 3476069, *42-43; *Sierra Club v. Va. Elec. & Power Co.*, 247 F. Supp. 3d 753 (E.D. Va. 2017).

Adopting this theory would be inconsistent with the text and structure of the CWA. The primary problem with this rationale is that, if adopted, "any non-point-source pollution (such as ordinary surface run-off from the land into navigable waters) could invariably be reformulated as point-source pollution by going up the causal chain to identify the initial point sources of the pollutants that eventually ended up through non-point sources to come to rest in

---

[2] Although an agency's interpretation of a statute that it administers is entitled to great deference, *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843–44 (1984), *Chevron* deference does not apply in this case because the "EPA has offered no formal or consistent interpretation of the CWA that would subject discharges to groundwater to the NPDES permitting requirement." *Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.*, 962 F. Supp. 1312, 1319 (D. Or. 1997). Since *Umatilla* was decided, the EPA has interpreted the CWA as applying to hydrologically connected groundwater in proposed rules, manuals, and informal guidances. [*See* Record No. 27, p. 37 n. 129.] However, interpretations such as these, "all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris Cty.*, 529 U.S. 576, 578 (2000). Instead, such interpretations "are 'entitled to respect,' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (citation omitted). For the reasons stated in this Memorandum Opinion and Order, the Court does not find the position expressed in these documents to be persuasive.

navigable waters." *26 Crown Assocs.*, 2017 WL 2960506, at *8.[3]  This would lead to the extensive regulation of non-point source pollution and would "effectively read the 'point source' requirement out of the Clean Water Act." *Id.* at *9.

Extending the reach of the CWA in this way also would be inconsistent with its federalist structure.  The CWA "does not purport to regulate (or to require a permit for) every act that involves the noxious pollution of clean water. Instead, consistent with long-established principles of federalism, the Clean Water Act's permitting requirements are limited to regulating the discharge of pollutants into the navigable waters of the United States." *Id.* at *6.  Regardless of the theory underlying the plaintiffs' claims, it remains the case that "Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that ground water is eventually or somehow 'hydrologically connected' to navigable surface waters." *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798, 810 (E.D.N.C. 2014).  Instead, Congress determined that the regulation of groundwater pollution was to be left to the states.  *See Train*, 554 F.2d at 1325-29; *see also Kelley*, 618 F. Supp. at 1107; *Or. Nat'l Res. Council*, 834 F.2d at 849.

The courts that have found that hydrologically connected groundwater is subject to the NPDES permit requirement have relied heavily on the purpose of the CWA.  *See, e.g.*, *Va. Elec. & Power Co.*, 247 F.3d at 762 ("Congress intended the CWA to protect the water quality

---

[3] Courts have attempted to mitigate this result by stating that non-point source groundwater pollution is only subject to the CWA when there is a "direct" hydrologic connection to navigable waters. *See, e.g.*, *Tenn. Clean Water Network*, 2017 WL 3476069, at *44.  However, because this requirement is not grounded in the text or legislative history of the CWA, the standards courts have employed to determine when a hydrologic connection is sufficiently "direct" to fall within this exception have varied.  [*See* Record No. 28, p. 12 n.13 (collecting standards adopted by different courts).]

of the nation's surface water. Where the facts show a direct hydrological connection between ground and surface water, that goal would be defeated if the CWA's jurisdiction did not extend to discharges to groundwater."); *Tenn. Clean Water Network*, 2017 WL 3476069, at *43 (quoting *N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620, 2005 WL 2122052, at *2 (N.D. Cal. Sept. 1, 2005) ("[I]t would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.")). However, the Supreme Court has "often criticized," relying on the statute's purpose to the detriment of its text "noting that no law pursues its purpose at all costs, and that the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *Rapanos*, 547 U.S. at 752 (plurality opinion). Further, "clean water is not the only purpose of the statute. So is the preservation of primary state responsibility for ordinary land-use decisions." *Id.* at 755-56 (plurality opinion). If the CWA pursued the goal of protecting surface water quality at all costs, it would not make sense to exempt *any* groundwater from the CWA given "the essential link between ground and surface waters and the artificial nature of any distinction." *Train*, 554 F.2d at 1325 (quoting S. Rep. No. 414, 92d Cong., 1st Sess. 73 (1971)). Indeed, the distinction between point- and non-point sources would appear untenable in light of this purpose, given that "non[-]point sources of pollution constitute a major source of pollution in the nation's waters." *Or. Nat'l Res. Council*, 834 F.2d at 849. However, Congress has decided to distinguish between ground and surface waters and between point- and non-point source pollution, and to regulate them differently. The Court declines to undermine these choices to effectuate the CWA's supposed purpose.

Accordingly, the Court finds that the discharge of pollutants to a navigable water via hydrologically connected groundwater is not subject to the CWA's NPDES permit requirement. As a result, the plaintiffs' allegations are insufficient to state a claim for the unlawful "discharge of a pollutant" without a permit under the CWA, and the plaintiffs' CWA claim will be dismissed. 33 U.S.C. §§ 1311(a); 1362(12).

## V.

For the foregoing reasons, it is hereby

**ORDERED** as follows:

1.    The defendant's motion to dismiss [Record No. 16] is **GRANTED**.

2.    The plaintiffs' RCRA claim is **DISMISSED**, without prejudice.

3.    The plaintiffs' CWA claim is **DISMISSED**, with prejudice.

4.    A corresponding Judgment will be entered this date.

This 28th day of December, 2017.

Signed By:

*Danny C. Reeves*  DCR

United States District Judge